In re John Hugh NILAND, Debtor.

Tim TRUMAN and John Hugh Niland, Plaintiffs,

v.

Darwin DEASON and Continental Savings Association, Defendants.

Darwin DEASON, Plaintiff,

v.

John Hugh NILAND and Continental Savings Association, Defendants.

Bankruptcy No. 384–30619–F.
Adv. Nos. 384–3299, 384–3300

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

April 25, 1985.

---

Philip I. Palmer, Jr., Palmer, Palmer & Coffee, P.C., Dallas, Tex., for the Debtor, John Hugh Niland.

W. Mike Baggett, Winstead, McGuire, Sechrest & Minick, Dallas, Tex., for Darwin Deason.

John R. Stooksberry, Boyd, Veigel, Gay & McCall, McKinney, Tex., for Continental Sav. Assn.

MEMORANDUM OPINION

MICHAEL A. McCONNELL, Bankruptcy Judge.

Plaintiffs, Tim Truman (the Standing Chapter 13 Trustee in the Northern Dis-

trict of Texas) and John Hugh Niland, bring this action seeking to set aside a non-judicial foreclosure sale of certain real property owned by Niland in Dallas, Texas. Plaintiffs contend that the deed of trust lien held by Continental Savings Association on the property was invalid due to superior homestead claims by Niland thereby voiding the subsequent foreclosure sale. Defendants, Darwin Deason and Continental Savings Association, deny that the sale should be set aside and assert that Niland is estopped from claiming the protections of the Texas homestead laws by reason of prior fraudulent homestead statements and affidavits.

Trial to the Court commenced on February 12, 1985; and the Court, having heard the evidence and the arguments of counsel, finds the following facts and enters conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules:

## FINDINGS OF FACT

1. On September 21, 1971, John Hugh Niland was married to and living with Naomi Iree Niland. Niland was employed at the time as a professional football player for the Dallas Cowboys.

2. On September 21, 1971, the Nilands purchased a home and lot located at 4717 Miron Drive, Dallas, Dallas County, Texas (the "Property") from Terry N. Tomlin and wife, Doris Marie Tomlin. The Nilands immediately moved into the home, thereafter claiming and maintaining it as their homestead.

3. The real estate description attached as Exhibit "A" to the Complaint of Niland in Adversary Proceeding No. 384–3299 and to Plaintiffs' Original Petition in Case No. 84–4052–D, now Adversary Proceeding No. 384–3300, is the correct legal description of the Property.

4. The total purchase price of the Property in September, 1971, was $90,000.00, of which $20,000 was paid in cash to the Tomlins by the Nilands, $60,000.00 was loaned to the Nilands and paid to the Tomlins by Dallas Federal Savings & Loan Associa-

tion, with $10,000.00 owed by the Nilands to the Tomlins.

5. Dallas Federal Savings & Loan Association secured its loan to the Nilands by a first lien deed of trust on the Property.

6. The Tomlins secured the $10,000.00 still due to them by the Nilands by a second lien deed of trust and vendor's lien on the Property. This second lien was paid in full by the Nilands in five years.

7. On the date of purchase in September, 1971, the Property was improved by a brick house containing 3 bedrooms, 3 baths, a living room, den and study, wet bar, stone walls and cathedral ceilings.

8. The land area of the Property is 1.574 acres with a 10–foot creek on the back side of the lot. Due to the unique topography of the lot, partition of the property into a one acre exempt portion and a .574 acre non-exempt portion would not be feasible or practical in this case. The Property is basically an irregular rectangle, fronting on the east line of Miron Drive, with its north line being along Bachman Creek, most of its east line also along the creek, and its west line contiguous to a single family lot. The house sits on the tip of a peninsula with steep grades to the creek on both sides. For an illustration, see p. 26 of Px. 95.

9. Because of periodic flooding, the entire lot is designated as "flood plain" by the City of Dallas.

10. On September 12, 1977, the Nilands purchased from Real Investments, Inc., a condominium unit ("the High Hollows condominium") known as Apartment No. 137 in Building J of "the Hollows North", a condominium project which is more particularly described in the Declaration of Condominium, filed March 8, 1977, recorded in Volume 77046, page 1256, of the Condominium Records of Dallas, County, Texas, together with an undivided .3652% interest in and to the general common elements described in said Condominium Declaration.

11. On or about January 1, 1980, Naomi Niland moved from the Property after filing an action for divorce styled, *In the*

*Matter of the Marriage of Naomi Iree Niland and John Hugh Niland,* being Cause No. 82–2143–R, District Court, 254th Judicial District, Dallas, Texas.

12. Niland was the principal of a business known as Video Information Network, Inc. ("VIN").

13. The business was not successful, and survived only by constant cash advances from Niland.

14. In late 1981, VIN was in need of additional cash to continue operations.

15. Neither VIN nor Niland had either the unsecured credit or available collateral for a loan in the amount needed.

16. The only assets of any consequence then owned by Niland was the Property and the Hollows North Condominium, Apartment No. 137.

17. In order to obtain the additional cash for VIN, Niland applied to Richardson Savings for a loan in the amount of $113,-500.00. As part of the loan transaction on January 4, 1982, Niland executed an affidavit to Richardson Savings and Loan Association in which he claimed Apartment 137 of the Hollows North Condominiums as his homestead. The affidavit stated that it was executed to induce Richardson Savings & Loan Association to make a mortgage loan to Niland. The affidavit was filed on January 21, 1982, in the Deed Records of Dallas County, Texas, in Volume 82014, page 0022. A copy of the affidavit was admitted into evidence as Exhibit No. 26.

18. Richardson Savings & Loan Association agreed to and did lend Niland $113,-500.00 using the Property as security upon a one-year "roll over" note at 18½% interest.

19. At that closing of the loan, the Nilands executed a deed of trust on the Property to 5.11 Corporation, as trustee, to secure the repayment of the loan from Richardson Savings & Loan Association. The deed of trust was filed of record on January 20, 1982, in the Deed Records of Dallas County, Texas, in Volume 82014, page 0011.

20. The balance remaining from the proceeds of the loan, after the payment of fees, taxes and expenses was $101,951.11 which was available to Niland.

21. The $101,951.11 was then utilized by Niland as follows:

(a) $55,299.28 to Dallas Federal Savings & Loan Association, as payment in full on its first lien on the Property;

(b) $46,651.83 was loaned to VIN.

22. The affidavit to Richardson Savings & Loan Association was a false representation by Niland.

23. The affidavit to Richardson Savings & Loan Association concerned a material fact relied upon to the extent it was a material factor in inducing Richardson Savings & Loan Association to make a mortgage loan to Niland.

24. At the time Niland executed the affidavit on January 4, 1982, Niland knew the affidavit was false or that it was made recklessly without any knowledge of its truth.

25. Niland made the affidavit with knowledge that it would be acted upon by Richardson Savings & Loan Association.

26. Richardson Savings & Loan Association acted in reliance upon Niland's affidavit.

27. On September 1, 1982, Niland entered into a Lease Agreement with Carol Wilkey and Elizabeth Lambert for a term of six months. The lessees agreed to pay Niland $600 per month to lease from Niland all of the Property except one bedroom for storage.

28. Throughout the three years prior to this time, Niland also rented the Property to other individuals although no written lease agreement was signed.

29. During the fall and winter of 1982–1983, Niland continued to seek additional financing for VIN.

30. In February, 1983, the Nilands entered into an agreement styled Agreement Incident to Divorce ("the Divorce Agreement"). In the Divorce Agreement, it was provided that Naomi Niland would execute

a warranty deed conveying her interest in the Property to Niland. Said deed was executed by Naomi Niland on February 10, 1983, and filed in the Deed Records of Dallas County, Texas, in Volume 83038, page 2669, on February 23, 1983.

31. On January 15, 1982, VIN executed a promissory note for $46,651.83 in favor of Niland, agreeing to repay Niland by sending monthly payments to Richardson Savings & Loan Association in the amount of $2,079.00.

32. The financial condition of both Niland and VIN continued to deteriorate throughout 1982.

33. By late 1982, the financial situation of both Niland and VIN had reached desperate straits.

34. During that same period, Niland had urgent need to receive back the $46,651.13 he had loaned to VIN.

35. The corporation was in no position to make the repayment, but instead required additional working capital in the amount of $100,000.00.

36. Niland then approached Continental Savings Association ("Continental") to borrow funds for himself and VIN, and Continental agreed to lend Niland $300,000.00 secured by a deed of trust upon the Property.

37. Niland was urgently in need of the money and offered $5,000.00 to Jerry Dale, the Continental loan officer, as a bribe or "grease payment" to expedite the loan. Dale took the money, and thereafter, on February 14, 1983, a closing was held on the Continental loan to Niland.

38. At the closing, Niland executed a Deed of Trust conveying the Property to David Wylie, as Trustee for Continental, to secure the $300,000 note. Niland also executed a Homestead Affidavit and Designation "to induce Continental to make a mortgage loan secured by a Deed of Trust" upon the Property, wherein Niland designated the High Hollows condominium as his legal homestead and declared that he did not reside upon or claim an interest in the Property as his homestead. The affida-

vit further stated that Niland expressly disclaimed, waived and renounced any homestead right, interest or exemption in the Property. Niland also declared in the Affidavit that he was refinancing the Property for investment purchases only, and not for personal, family or household purposes and that he did not intend to occupy the Property nor to permit any member of his family to occupy same. A copy of the affidavit was admitted into evidence as Exhibit No. 46.

39. Out of the loan proceeds, Continental used $119,371.85 to pay off the first lien on the Property which was held by Richardson Savings & Loan Association. The remaining balance was available for Niland's use.

41. The Affidavit to Continental was a false representation by Niland.

42. The Affidavit to Continental concerned a material fact relied upon to the extent it was a material factor inducing Continental to make a mortgage loan to Niland.

43. At the time Niland executed the Affidavit on February 14, 1983, Niland knew the Affidavit was false or that it was made recklessly without any knowledge of its truth.

44. Niland made the Affidavit with knowledge that it would be acted upon by Continental to its detriment.

45. Continental did act in reliance upon Niland's Affidavit by granting Niland the loan secured by a deed of trust on the Property.

46. Continental and its assigns, including Deason, suffered injury as a result of its reliance upon Niland's materially false Affidavit.

47. On February 18, 1983, Technical Chemical Company recovered judgment by default against VIN and Niland, jointly and severally, in Cause No. 82–16117–D in the 95th Judicial District Court, Dallas, Texas. An Abstract of Judgment was filed in the Judgment Records of Dallas County, Texas, in Volume 83056, page 0747.

48. On October 14, 1983, the President of Technical Chemical Company, N. Howard Dudley, executed a Release of Judgment Lien against the High Hollows condominium based on Niland's declaration that the High Hollows property was his homestead. As a result of Niland's declaration and the Release of Judgment, Technical Chemical Company was unable to satisfy its judgment lien against the High Hollows property based upon the protection afforded homestead claimants under Texas law.

49. Niland, under the terms of the Divorce Agreement, agreed to execute a one-year note in the principal amount of $55,000.00 and a deed of trust on the Property in favor of Naomi Niland to secure repayment of the note. On April 18, 1983, Niland executed a Real Estate Lien Note in the original principal amount of $55,000.00 payable to Naomi Niland. On the same date, the Second Deed of Trust on the Property which was executed by Niland to secure the Real Estate Lien Note was filed of record in the Deed Records of Dallas County, Texas, in Volume 83076, page 3967.

50. On March 15, 1983, a release of lien was executed by Richardson Savings & Loan Association for the deed of trust lien it held on the Property.

51. In March of 1983, Niland consulted with a self-styled financial advisor named Clifford Sugerman ("Sugerman") regarding Niland's financial difficulties.

52. The advice given by Sugerman included the suggestion that Niland make no mortgage payments to Continental but instead, allow Sandra Sugerman to sell the house and use the proceeds of sale to pay off the note to Continental.

53. The wife of Sugerman is Sandra Sugerman, a real estate agent who was employed with Stone & Company Realtors.

54. Niland followed Sugerman's advice and made no mortgage payments to Continental. Sandra Sugerman originally listed the Property for sale at $545,000.00, and subsequently reduced the asking price to $495,000.00.

55. On June 9, 1983, Lawrence Fischman, Esq. ("Fischman"), of the firm of Boyd, Veigel, Gay & McCall, advised Niland that his client, Continental, had accelerated the amounts due and owing Continental under the terms of the Note as a result of Niland's failure to pay the monthly debt-service payments. The balance due Continental on the Note on that day was $313,426.03, with interest accruing at the rate of $110.96 per day.

56. On July 12, 1983, Continental appointed Fischman as Substitute Trustee.

57. On July 30, 1983, Darwin Deason first saw the Property which was listed for sale at the time. Deason then contacted Sandra Sugerman and told her he was interested in purchasing the Property. Deason and his wife were shown the Property by Sandra Sugerman on July 31, 1983. Niland was present at the Property when they arrived.

58. On July 31, 1984, Sandra Sugerman suggested that Deason contact her husband, Cliff Sugerman, to discuss the sale of the Property. Deason did contact Sugerman without reaching an agreement on the purchase of the Property by Deason.

59. Deason then was made aware that the Property was being foreclosed upon and that the foreclosure sale was scheduled for Tuesday, August 2, 1983. Deason attended the foreclosure sale with the intention to bid on and purchase the Property at the sale.

60. At the sale, Deason was the high-bidder for the Property with a bid of $320,000.00. There is no evidence in the record that the sale was anything other than a regularly conducted non-collusive foreclosure sale. Moreover, there is no evidence that the Substitute Trustee or any representative of Continental made any oral representations at the sale concerning the Property or title to the Property.

61. Later the same day Fischman, as Substitute Trustee, executed a Substitute Trustee's Deed to Deason in consideration of the payment of a cashier's check in the amount of $320,000.00. The Deed was de-

livered to Deason at Fischman's law office where Deason and his attorney reviewed the Deed and the representations and disclaimers contained therein before its delivery. There is no evidence in the record whatsoever concerning any fraud or misrepresentations on the part of Continental Savings in its dealings with Deason.

62. At the date of the foreclosure sale, the fair market value of the Property was approximately $370,000.00. The purchase price paid for the Property by Deason was in excess of 70% of the fair market value of the Property. The improvements to the Property comprised only approximately $40,000.00 of the total value.

63. On August 4, 1983, Deason wrote a letter to Niland wherein Deason agreed to allow him to continue to live on the Property upon certain terms and conditions.

64. On August 23, 1983, Fischman wrote a letter to Niland, advising him that Continental held $2,538.34 excess due to him, and that he should contact Fischman as to its disposition.

65. When Niland visited with Fischman, he was presented with the draft of a complete release which he had to sign before receiving the $2,538.34 excess. Niland did not execute the release and has not received the $2,538.34.

66. On October 12, 1983, Deason wrote Niland a letter giving him 30 days in which to move from the Property.

67. On February 27, 1984, Deason wrote to Niland stating that he had accepted a contract for sale on the Property, and that Niland must vacate the premises by March 11, 1984.

68. On March 12, 1984, Deason filed a Forceable Entry and Detainer suit against Niland, being Case Number 51852 in the Justice of the Peace Court, Precinct One, Dallas County, Texas.

69. On March 28, 1984, Deason filed Plaintiff's Original Petition against Niland and Continental, being Case Number 84–4052–D in the District Court of Dallas County, Texas.

70. On April 30, 1984, Niland filed for relief under Chapter 13 of the Bankruptcy Code.

71. From September 21, 1971 to the present, Niland has lived in open, actual and obvious possession of the Property at 4717 Miron Drive, Dallas, Texas.

72. Neither John nor Naomi Niland, together or separately ever resided in the High Hollows condominium.

73. Mrs. P.D. Niland, John Niland's mother, lived in the High Hollows condominium from its purchase in 1977 through October, 1983.

74. From the evidence before this Court, this Court finds that at no time did John Niland ever intend to abandon the Property as his homestead or make the High Hollows condominium his homestead.

75. The Property at 4717 Miron Drive was the homestead of John Niland on September 21, 1971 and remains so to the present day.

76. Any finding of fact deemed a conclusion of law is so adopted.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties to this action.

2. Deason's Cross-Claim and Amended Cross-Claim state a claim against Continental upon which relief can be granted. This Court has jurisdiction over Deason's Cross-Claim and Amended Cross-Claim against Continental.

3. This action was originally initiated by Niland and Truman for avoidance of an allegedly fraudulent transfer pursuant to the Trustee's avoiding powers under 11 U.S.C. § 548. Niland also raised a state law cause of action alleging that the property in question was his homestead and that the foreclosure sale on August 2, 1983 was void.

4. Deason responded to the Complaint in his Answer denying that the sale should be set aside as a fraudulent transfer, as Niland's homestead or otherwise. In the

event the Property was found to be Niland's homestead, Deason asserted that Niland was estopped from claiming the protections of Texas homestead law. Deason also asserted a Counterclaim against Niland based upon breach of the warranties and representations contained in the Substitute Trustee's Deed, as well as a cause of action for fraud. Deason has also asserted a Cross-Claim against Continental based upon breach of the representations and warranties contained in the Substitute Trustee's Deed, fraud and constructive trust.

5. Plaintiffs, Niland and Truman, initiated Adversary Proceeding No. 384–3299 on May 8, 1984, by filing their Complaint with this Court. On the same date, Niland and Truman filed a Petition for Removal which removed to this Court the suit filed by Deason, as Plaintiff against Niland in Case No. 84–9052, District Court, 95th Judicial District, Dallas County, Texas. The state court action was given the designation Adversary No. 384–3300. Plaintiffs then filed a Motion to Consolidate wherein they sought to consolidate, in Adversary Proceeding No. 384–3299, the state court action initiated by Deason. The Motion to Consolidate was then granted by this Court for all purposes pursuant to Rule 7042 of the Bankruptcy Rules.

6. Plaintiffs announced at trial that their fraudulent transfer claim under 11 U.S.C. § 548 would no longer be pursued because their discovery revealed that the amount paid to the Substitute Trustee at the foreclosure sale by Deason exceeded 70% of the fair market value of the property on the date of foreclosure. The doctrine announced by the Fifth Circuit in *Durrett v. Washington National Ins. Co.*, 621 F.2d 201 (5th Cir.1980) would, therefore, be inapplicable.

7. Plaintiffs' remaining cause of action concerns the alleged invalidity of the Continental Savings lien on the Property. Plaintiffs contend that the indebtedness secured by the lien is unrelated to purchase money or home improvements, and therefore the lien suffers from a constitutional infirmity.

Defendants contend that, even if true, Niland is estopped by his actions from claiming the protections of Texas homestead law.

8. The evidence introduced at trial is replete with examples of fraudulent statements by Niland with respect to the homestead character of his property. On the basis of false affidavits, Niland obtained a $113,500.00 loan from Richardson Savings in January, 1982 and a $300,000.00 loan from Continental Savings in February, 1983. Moreover, Niland was successful in obtaining a release of an abstract of judgment lien on the High Hollows condominium in October, 1983 by again executing a false homestead affidavit.

9. Defendants also point to a multitude of false declarations in additional unrelated credit forms and applications with respect to Niland's homestead as evidence in favor of estoppel. Nor has Niland satisfactorily explained his deposition testimony in his divorce proceeding on April 14, 1983 to the effect that the High Hollows condominium was his homestead. It is readily apparent that Niland was prepared to sign and swear to any statement regardless of its truth if the statement resulted in the extension of further credit or an escape from liability.

10. Well-established Texas law, however, apparently protects such conduct. Beginning with the seminal opinion by Chief Justice Stayton of the Supreme Court of Texas in *Texas Land & Loan Co. v. Blalock*, 76 Tex. 85, 13 S.W. 12 (Tex.1890), Texas courts have consistently held that no estoppel can arise in favor of a lender, who has attempted to secure a lien on homestead property in actual use and possession of a family, based on declarations of a husband and wife *to the contrary*.

Even though Judge Stayton conceded that the homestead declarations in the loan application and deed of trust executed by the Blalocks *"went as far as words could go* to assure the lender that it might safely lend its money without fear that the lien would be defeated by the existence of homestead rights"*, he held that actual,

open and obvious possession of property was controlling and denied the claim of estoppel.

> Here nothing was hidden. Possession was open, certain and in character in no respect ambiguous. It was such as gave homestead right, and the lender cannot be heard to say that it did not know it. The constitution forbidding the fixing on the homestead of liens other than such as are thereby expressly permitted, no estoppel can arise in favor of a lender, who has attempted to secure a lien on homestead in actual use and possession of the family, based on declarations of the husband and wife, made orally or in writing, contrary to the fact. To hold otherwise would practically abrogate the constitution. If property be homestead in fact and law, lenders must understand that liens cannot be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead, contrary to the fact, will enable parties to evade the law, and incumber homesteads with liens forbidden by the constitution. *Mortgage Co. v. Norton,* 71 Tex. 683, 10 S.W.Rep. 301, *Pellat v. Decker,* 72 Tex. 581, 10 S.W.Rep. 696; *Kempner v. Comer,* 73 Tex. 203, 11 S.W.Rep. 194. 13 S.W. at 13.

11. Similarly, in *American Exchange National Bank v. Jeffries,* 36 S.W.2d 558 (Tex.Civ.App.—Dallas, 1931 writ dism'd), Chief Judge Jones of the Dallas Court of Civil Appeals, citing *Blalock,* held that the parties seeking to void the lien (the Jeffries) were not estopped by false declarations in loan documents from claiming homestead rights. The Jeffries owned two tracts of real property in Sherman, Texas— one located on Cherry Street and the other situated on Jones Street. On April 13, 1925, the Jeffries moved into the property on Cherry Street, established a homestead, and continued to live on the property as their homestead through the litigation. The Jeffries also owned another piece of residential property in Sherman, situated on Jones Street, but never lived on the property and never in any way used the property as their homestead.

On May 10, 1927, more than two years after the property on Cherry Street became subject to their homestead rights, the Jeffries signed a note and deed of trust containing recitations to the effect that no part of the Cherry Street property was their homestead and that their homestead was in fact on the Jones Street property. Similar representations were made in their loan application. Judge Jones noted the following relevant facts as found by the trial court:

> The Jones Street property, designated as a homestead in the deed of trust, was occupied by the father of appellee C.R. Jeffries, and no rent was charged him for the use of the premises. An inspector of the Federal Mortgage Company, before the loan was accepted, inspected the premises, knocked at the door of the Cherry Street house, but received no response, and concluded that the occupants of the house were absent. He made no inquiry from neighbors or any one else as to who occupied the premises at such time, and did not visit the Jones Street property or make any inquiry as to its occupancy. The Federal Mortgage Company relied exclusively upon the homestead designation and the statements, respectively, in the deed of trust and the application for the loan as to the homestead rights of appellees, though the physical facts showed that appellees were residing on the Cherry Street property at the time the loan was executed, and were not residing on the Jones Street property, designated as their homestead. 36 S.W.2d at 559.

Judge Jones held that the attempted lien on the Cherry Street homestead property was void and that under the facts of the case the Jeffries were not estopped to plead and prove that the property in question was their homestead. Judge Jones cited *Blalock* for the proposition that:

> "Every person dealing with land must take notice of an actual open and exclusive possession; and when this, concur-

ring with interest in the possessor, makes it homestead, the lender stands charged with notice of that fact, it matters not what declarations to the contrary the borrower may make." 36 W.S.2d at 560.

12. The extent of this doctrine is perhaps best illustrated by the decision of the Supreme Court of Texas in *Nixon v. Hirschi*, 134 Tex. 415, 136 S.W.2d 583 (1940) where the Supreme Court reversed the prior holding of the Fort Worth Court of Civil Appeals that a husband and wife were estopped to deny the validity of a prior trust deed and homestead designation in claiming homestead rights. In *Hirschi*, the trial court originally found that the Nixons executed a false homestead designation and made false homestead representations in certain loan documents. A Trustee acting for the benefit of Standard Savings and Loan Association later foreclosed the deed of trust lien and Hirschi purchased the property at the foreclosure sale. The trial court found for the Nixons and an appeal was taken.

Justice Brown, writing the opinion for the Fort Worth Court of Civil Appeals, reversed the trial court and held that the Nixons were estopped from denying the validity of the deed of trust lien given to Standard Savings and Loan Association. Speaking for the unanimous panel, Justice Brown commented as follows:

> "This writer is of the opinion that the pendulum has swung too far in Texas in protecting those who deliberately enter into schemes to secure loans on their homesteads and then repudiate their solemn acts, on the specious plea that the lender was duty bound to make a minute investigation to ascertain whether or not the borrower is attempting to practice a fraud on him. The writer believes this protection should go to the innocent only and that the guilty should not receive it." *Hirschi v. Nixon*, 103 S.W.2d 833, 836 (Tex.Civ.App.—Fort Worth 1937).

The Supreme Court then granted a writ of error from the Fort Worth Court of Civil Appeals and reversed. The Supreme Court noted that the uncontradicted evidence showed that the Nixons were actually occupying the premises in controversy and that it was their homestead when the loan was made by the Defendant and the deed of trust was executed in its favor by the Plaintiffs. Based on these findings, the Supreme Court held that the Plaintiffs were not estopped from asserting their homestead rights in the property involved by reason of the false and fraudulent representations made by them with respect to the loan.

13. A minority position among the Texas courts is illustrated by the holding of the Fort Worth Court of Civil Appeals in *Brown v. Federal Land Bank of Houston*, 180 S.W.2d 647 (Tex.Civ.App.—Fort Worth 1944, ref'd w.o.m.). In that case, a husband and wife executed a second lien deed of trust on land as security for a loan which they obtained as a result of representations that the proceeds were to be used partially for payments on the prior lien and that the second lien deed of trust would be a valid lien on the property. Thereafter, the husband and wife claimed the property was actually and factually their homestead prior to and after the loan transaction and that the asserted second lien was void in violation of the homestead protections. The second lien mortgagee asserted in response that the homestead claimants were estopped as a matter of law to assert the invalidity of the debt and lien sought to be foreclosed.

The Fort Worth Court of Civil Appeals relying upon *Eylar v. Eylar*, 60 Tex. 315 (1900) and *Ramirez v. Smith*, 94 Tex. 184, 59 S.W. 258 (Tex.1900) held that as a matter of law the homestead claimants were estopped to deny the validity of the second lien irrespective of the open and notorious possession of the property. The Court held that, even with notice of open and notorious possession of the property by the mortgagors, the second lien mortgagee could rely on deed records indicating a good second lien granted by the mortgagor, whether assumed to be for purchase money or improvements.

478

■ 14. Although the holding in *Brown* certainly has merit, the rulings of the Texas Supreme Court have been clear and consistent to the contrary. Accordingly, based upon *Texas Land Loan Co. v. Blalock* and its progeny, this Court finds and concludes as a matter of fact and law that Niland established a homestead at 4717 Miron Drive on September 21, 1971 and that the property remains Niland's homestead to the present day. Because of Niland's open, actual and exclusive possession of the property, Niland is not estopped to deny the homestead character of the property even in the face of numerous false and fraudulent declarations to the contrary.

15. Because of the Court's ruling that the Continental lien is invalid with regard to Niland's homestead interest in the Property, the Court must now consider the following issues of law set forth in the Pre-Trial Order (Sec. VII, Nos. 7–8):

(a) Whether the Texas Constitutional Amendment concerning homesteads is to be applied retroactively. If it is not applied retroactively, what portion of the Property, if any, is exempt under Texas homestead law.

(b) If the amendment to the Texas Constitution concerning homesteads limits Niland's homestead to one acre, how is the designation of that one acre to be determined when the property in question exceeds one acre and what claims may be made or impressed against the excess held by Deason.

16. The relevant homestead provisions under Texas law are found in Art. XVI, §§ 50–51 of the Texas Constitution. Section 50 provides in pertinent part as follows:

The homestead of a family, or a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof . . .

Section 51 of Art. XVI was recently amended and approved by the voters of this state on November 8, 1983, which changed the homestead provisions from *value exemption* to an *area exemption*. The exemption is now one acre for an urban homestead together with any improvements on the land. TEX. PROPERTY CODE ANN. § 41.001(a)(2) (Vernon 1984). To date, there are no decisions which have addressed the question of the retroactive application of the homestead amendment.

■ 17. The enabling legislation passed by the Texas Legislature in 1984 to conform to the 1983 Constitutional amendment, however, seems to express a clear legislative intent to have the amendment "relate back" to the creation of any urban homestead.[1] Section 41.001(c) of the Texas Property Code expressly provides that:

(c) "The exemptions provided to homesteads under this section apply to all homesteads in this state *regardless of the date they were created*" (emphasis ours).

18. Because of the relation-back of the amendment to Art. 16, § 51, Niland's homestead exemption in the Property is limited to one acre together with the improvements; and, therefore, Deason certainly took good title at the foreclosure sale to .5714 acres of the Property. In effect, Deason and Niland have become "co-tenants" of the Property.

19. Having disposed of Niland's homestead claims and having found the sale to be partially void, the Court now turns to the claims of Deason against Niland. Deason asserts that if the Court determines the sale to be wholly or partially void he should be subrogated to the lien and debt of Continental Savings to the extent of the $320,000.00 paid at the foreclosure sale.

■ 20. Under Texas law, a purchaser who purchases property at an invalid fore-

1. The relation-back of the Texas Constitutional amendment apparently conflicts with well-settled bankruptcy law that the debtor's exemption rights are fixed on the date of filing the petition, *see e.g., White v. Stump,* 266 U.S. 310, 45 S.Ct. 103, 69 L.Ed. 301 (1924); *Hollytex Carpet Mills v. Tedford,* 691 F.2d 392, 393 (8th Cir.1982); *In Re Harlan,* 32 B.R. 91 (Bankr.W.D.Tex.1983); but this Court resolves the conflict in favor of state law. The Debtor's exemption rights flow from and should be governed by state law.

closure sale has been given remedies under the theory of subrogation. The relatively few cases which have addressed this issue have held that the remedy available to a purchaser of property at a void or irregular foreclosure sale is to become subrogated to the lien and debt to the extent of the payment made. *Faires v. Cockerell*, 31 S.W. 190 (Tex.1895); *Johnson v. Frierson*, 133 S.W.2d 594 (Tex.Civ.App.—Waco 1939, writ dism'd); *Ford v. Emerich*, 343 S.W.2d 527 (Tex.Civ.App.—Houston 1961, writ ref'd n.r.e.). Since at least a portion of Continental Saving's lien which was conveyed to Deason by foreclosure has been determined to be valid, the rule in *Faires* is applicable.

21. It has been noted by the Fifth Circuit Court of Appeals that "subrogation is perhaps the purest of equities. It is applicable in cases where the party invoking it has, without being a volunteer, paid a debt for which another is primarily answerable, and which in equity and good conscience that other ought to pay. Subrogation is typically allowed when not to allow it would result in an unjust enrichment." *Yonack v. Interstate Securities Company of Texas*, 217 F.2d 649, 651 (5th Cir.1954). It has also been noted by the *Yonack* court that "subrogation, founded on principles of natural reason and justice and being one of the benevolences of the law, it is a highly favored doctrine and one which has been most liberally dealt with in the courts. Perhaps no doctrine of equity jurisprudence is more beneficent in its operations, and perhaps none stands in higher favor." The *Yonack* court, in applying Texas law has found that "the courts of Texas have been peculiarly hospitable to the right of subrogation and have been in the forefront in upholding the right to it."

22. In the *Faires* case, the court did not address the law in a factual context involving an invalid foreclosure. Instead, the case involved payment of a note by one other than the maker, and the court addressed the issue of whether the theory of subrogation allows the assignment of the securities of the principal creditor upon payment of the debt by another.

In addressing the question, the court made a comprehensive and thorough analysis of the doctrine under then existing Texas law. From that examination of the authorities, the court reached the conclusion that "when the creditor has no security from either of the payors, and the debt itself holds no lien upon property, nor is for any reason entitled to priority over other debts of the debtor, the payment of the debt by a co-obligor or a surety satisfies the original debt, and the party paying has his right of action against the others, upon the implied promise raised by law, for his reimbursement, according to their several liabilities". The court, however, went further in its holding and applied the principle to the factual context of this case stating by way of *dicta:*

> "One who discharges the vendor's lien upon land,—even the homestead—either by paying as a surety, or at the request of the debtor, *or at a judicial sale, which, for irregularities in the process, fails to convey the title*, is entitled to be subrogated to the lien of the creditor to the extent of the payments so made." (emphasis ours).

23. This case and its holding was approved and clarified by the Supreme Court of Texas in *Fox v. Kroeger*, 119 Tex. 511, 35 S.W.2d 679 (1931). In *Fox*, the court illuminated the issue of what exactly a party became subrogated to, stating:

> "He to whom a creditor makes over a debt is substituted to the right, and he acquires together with the credit, the mortgages and privileges which are annexed to it, whether the assignment be made for valuable consideration or gratis."

24. Importantly, the *Faires* rule has been applied to homestead property. In *Henke v. First Southern Properties, Inc.*, 586 S.W.2d 617, 621 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.), the court addressed the question of whether a purchaser at a void foreclosure sale should get his purchase price back from the mortgagee. Importantly, the foreclosure sale was void because the debtor was not in default. The

court held that the debtor would regain possession of the property and the buyer at the foreclosure sale would be subrogated to the mortgagee's lien. The court held that "one who discharges the vendor's lien upon lands, —*even the homestead*—, either by paying as surety, or at the request of the debtor, or at a judicial sale, which, for irregularity in the process, fails to convey the title, is entitled to be subrogated to the lien of the creditor to the extent of the payment made." [citations omitted] (emphasis ours).

25. Of course, the measure of damages in this case cannot be the full $320,000.00 purchase price paid by Deason since there has only been a partial failure of title. The courts of Texas have recognized that there is a limitation on the amount of recoverable damages when total failure of title does not occur. In the analogous situation of a partial breach of warranty, a warrantee evicted from a portion of the premises or who receives less than full title to all the property conveyed is not entitled to recover for a total breach if a portion of the property has been conveyed. *Farmers' and Merchants' State Bank & Trust Company v. Cole*, 195 S.W. 949 (Tex.Civ.App.—El Paso 1917, no writ). In ascertaining the amount of damages to which the warrantee is entitled, the courts attempt to establish the actual value of the portion to which title has failed. *Hines v. Packard*, 45 S.W. 562 (Tex.1898).

■ 26. In this case, therefore, the proper measure of damages under the subrogation theory would be that portion of the $320,000.00 allocable to that portion of Deason's title that failed minus the value of the improvements (i.e. $320,000 - {}^{1000}/_{1574} \times \$320,000 - \$40,000 = \$163,303.68$).

27. With respect to pre-judgment interest, the Texas Supreme Court in *Faires v. Cockerell, supra* at 194, stated that "it has been held by our court and others that where one is subrogated to the securities held by the creditor he is *not entitled* to recover the rate of interest expressed in the judgment or note which is the evidence of the debt. The amount of the payment made, with legal interest is the measure of recovery." (emphasis ours).

■ 28. It is obvious from the cases discussed above regarding equitable subrogation that the courts simply assumed that the party seeking relief would be subrogated to a valid lien. In the present case, the foreclosure sale has been held to be partially invalid and thus Deason will be subrogated to a worthless position since the Continental lien is partially invalid. The Court finds that in this situation there is authority for the imposition of an equitable lien.

A recent Texas Supreme Court case has addressed this issue in a situation involving homestead property. *McGoodwin v. McGoodwin*, 671 S.W.2d 880 (Tex.1984). In *McGoodwin*, a case involving the enforcement of a lien against homestead property conveyed in a divorce settlement, the court recognized that a lien may arise by implication in favor of one who has paid purchase money for the property. The court acknowledged that a "natural equity" would be impressed on the land creating a constructive trust in the vendee to prevent unjust enrichment." Thus, under the rule of *McGoodwin*, Deason, upon paying the purchase price for the land is entitled to an equitable lien upon that portion of the Property not conveyed as a result of Niland's homestead claim. As recognized in *McGoodwin*, the character of the property as homestead should not affect the imposition of such a lien.

■ 29. Furthermore, it is a well-established principle of Texas law that "a court of chancery may imply and declare a lien, even in the absence of an express contract, based on general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings". *Hodges v. Leach*, 214 S.W.2d 837, 841 (Tex.Civ.App.—Amarillo 1948, no writ); *First National Bank of Big Spring v. Conner*, 320 S.W.2d 391, 394 (Tex.Civ.App.—Amarillo 1959, writ ref'd n.r.e.); *Longhart Supply Co. v. Keystone Pipe & Supply Co.*, 26 S.W.2d 389, 392 (Tex.Civ.App.—Fort Worth 1930, writ ref'd); *Rountree Motor Co. v. Smith Motor Co.*, 109 S.W.2d

296, 300 (Tex.Civ.App.—Beaumont 1937, writ dism'd); 36 TEX.JUR.2d Liens § 18.

30. This well accepted principle of equity was recognized by Chief Justice Bond of the Dallas Court of Civil Appeals in *Williams v. Greer*, 122 S.W.2d 247, 248 (Tex. Civ.App.—Dallas 1938, no writ) where he stated:

"A lien, in its most extensive significance, is a charge upon property for the payment or discharge of a debt or duty. Liens may be broadly classified as common law, equitable and statutory, depending on the source from which they are derived. A common law lien is a right extended to a party to retain that which is in his possession belonging to another, until the demand or charge of the person in possession is satisfied. Common law liens are used to designate all the various charges of debt upon land or personal effects which are created by statute or recognized in equity, although neither connected with nor dependent upon possession. Thus, we have the lien of a judgment, the lien of an execution, the lien of a partner, the lien of a pledgee, the lien of a legal or equitable mortgage, and various other named charges which are denominated liens. After a transaction resolves itself into a security, whatever may be its form, and whatever name the parties may choose to give it, is in equity a lien. *Hence, one deprived of the possession of real or personal property by artifice or fraud of another, equity implies and declares out of general consideration of right and justice, as between the parties, a lien on the property to secure the charge legally or equitably assessed against it. It is not necessary that a lien is created by express contract or by operation of the statute; courts of equity will apply the relations of the parties and the circumstances of their dealings in establishing a lien based on right and justice.* (emphasis ours).

**2.** The Court recognizes, of course, that the imposition of an equitable lien against homestead property is not without controversy. In fact, the issue (with somewhat unrelated facts) is

31. It is suggested by this Court that the facts of this case warrant the imposition of such an equitable lien. It is unquestioned that Deason is an innocent party who inadvertently became entangled in Niland's dealings with Richardson Savings and Continental Savings by bidding at the August 3, 1983 foreclosure sale. Without the equitable lien, the amounts awarded to Deason in this judgment will have no value because of the effect of Niland's Chapter 13 discharge and Deason will be without any adequate remedy at law due to his inability to otherwise bid at any judicial sale as a credit against *secured* debt.[2]

32. Based upon the foregoing discussion, the Court finds and concludes as a matter of fact and law that Deason is entitled to judgment against Niland for $163,-303.68, plus pre-judgment interest at the Texas legal rate from August 3, 1983 to date of judgment. Deason is also entitled to an equitable lien against the Property to secure payment of the amount awarded which will relate back to the filing date of the Continental Savings lien and thus will be superior to the deed of trust lien of Naomi Van Cleve.

33. Based upon the foregoing discussions, the Court further finds and concludes that a judgment should be entered declaring the interest of Deason in the Property to be an undivided .5714 acres free and clear of any claim, lien or encumberance junior to the lien of Continental Savings. The judgment should further declare that Niland's interest in the Property is an undivided one acre together with the value of the improvements subject to Deason's equitable lien and further subject to the deed of trust lien of Naomi Van Cleve.

34. Because the Court has previously found the Property to be incapable of being partitioned in kind and because the Court has found Niland and Deason to be co-owners of the property, the Trustee may wish

presently pending before the Fifth Circuit in Appeal No. 84–1082, *Republicbank v. Daves* (argued 12/3/84).

**482**

to file an application to sell the Property under Section 363(h) of the Bankruptcy Code. Presumably, Deason would be entitled to rights under Section 363(k) at the sale.

35. Judgment shall be entered in conformity with this Memorandum Opinion.

36. Any conclusion of law deemed a finding of fact is so adopted.

37. The prior Memorandum Opinion of this Court, dated March 6, 1985, is hereby withdrawn and replaced by this Memorandum Opinion.

38. The Clerk is directed to enter this Memorandum Opinion and accompanying Judgment and to furnish copies to the attorneys listed below in conformity with Rules 9022 and 7005 of the Bankruptcy Rules.