825 F.2d 801
 Bankr. L. Rep. P 71,664
In re John Hugh NILAND, Debtor.
Tim TRUMAN and John Niland, Plaintiffs-Appellees,
v.
Darwin DEASON, Defendant-Appellant,
v.
CONTINENTAL SAVINGS ASSOCIATION, Defendant-Appellee.
 No. 86-1005.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 12, 1987.
 
 W. Mike Baggett, Linda G. Lucas, Dallas, Tex., for Deason.
 Philip I. Palmer, Jr., Dallas, Tex., for Niland and Truman.
 Michael S. Holmes, Bernard Wm. Fischman, Houston, Tex., for Continental Sav. Assn.
 Appeal from the United States District Court for the Northern District of Texas.
 (Opinion February 10, 5th Cir.1987, 809 F.2d 272)
 Before POLITZ, RANDALL and JOLLY, Circuit Judges.
 RANDALL, Circuit Judge:
 
 ON PETITION FOR REHEARING
 
 1
 John H. Niland petitions for panel rehearing in this case. Niland argues that the original panel opinion in this case, reported at 809 F.2d 272, is in error in holding that, under Texas law, Niland is estopped from claiming his Texas homestead exemption. Upon further reflection, the panel agrees. Hence, we grant rehearing, withdraw the original panel opinion, and substitute the following opinion in its place.
 
 
 2
 Darwin Deason appeals from the judgment of the district court, which, in an unpublished opinion, affirmed in part and reversed in part the decision of the bankruptcy court, reported at 50 B.R. 468 (Bankr.N.D.Tex.1985). For the reasons that follow, we affirm.
 
 I. FACTS
 
 3
 The material facts in this case, as found by the bankruptcy court, are not in serious dispute. In September of 1971, John Niland and his wife, Naomi Niland, purchased a home and lot located at 4717 Miron Drive, in Dallas County, Texas ("the property"), for $90,000, paying $20,000 in cash and obtaining a $60,000 loan from Dallas Federal Savings & Loan Association ("Dallas Federal"), and owing the sellers $10,000. The loan from Dallas Federal was secured by a first lien deed of trust on the property, and the $10,000 owed the sellers was secured by a second lien deed of trust.
 
 
 4
 The Miron Drive property is shaped in an irregular rectangle consisting of 1.5714 acres, and is bordered on the east by Miron Drive, on the west by another single-family lot, and on the north by Bachman Creek. A three bedroom brick home is on the property. The Nilands lived on the property and maintained the house as their residence until their separation in 1980, after which time only John Niland lived on the property. Pursuant to a divorce agreement entered into by the Nilands, Naomi Niland conveyed her interest in the property to John Niland by warranty deed on February 10, 1983. The bankruptcy court found that Niland lived in open, actual, and obvious possession of the property from September 1971 to the present, but that Niland rented the property to several individuals between 1979 and 1982.
 
 
 5
 In September of 1977, the Nilands purchased a condominium unit in the Hollows North condominium development project ("the condominium"). The Nilands never maintained the condominium as their residence, nor did John Niland reside there after his separation from Naomi Niland. Mrs. P.D. Niland, John Niland's mother, lived in the condominium from its purchase in 1977 until her death in October of 1983.
 
 
 6
 Niland was the principal of a business called Video Information Network, Inc. ("VIN"). VIN was not successful, and required frequent cash advances from Niland to stay in business. In 1982, in order to obtain cash for VIN, Niland sought to borrow $113,500 from Richardson Savings & Loan Association ("Richardson"), with the property as security for the loan. Prior to obtaining the loan, and in order to induce Richardson to loan the money to Niland, Niland executed an affidavit stating that the condominium was his homestead. The affidavit was filed in the deed records in Dallas County. Richardson loaned Niland the money, and Niland gave Richardson a deed of trust covering the property. Niland used the proceeds of the loan to pay off the note and first lien on the property held by Dallas Federal, and loaned the remainder of the money to VIN.
 
 
 7
 In order to obtain additional financing for VIN, Niland approached Continental Savings Association ("CSA") in late 1982 for a loan in the amount of $300,000, to be secured by a first lien on the property. In order to expedite the loan, Niland gave a $5,000 bribe to a CSA loan officer. In order to induce CSA to make the loan, Niland executed a false "Homestead Affidavit and Designation" which claimed the condominium as his homestead and stated that he did not reside upon or claim the property as his homestead. The affidavit also purported to disclaim, waive, and renounce any homestead right in the property, and stated that Niland did not plan to reside on the property or allow a member of his family to occupy the property. It is undisputed, however, that Niland was in fact living on the property at the time that he executed the affidavit.[1] In reliance on this affidavit, CSA loaned Niland $300,000 secured by a deed of trust on the property. Approximately $120,000 of the loan proceeds were used to pay off Richardson's first lien on the property, which was released on March 15, 1983, and the remainder of the money went to Niland.
 
 
 8
 On February 18, 1983, Technical Chemical Company ("TCC") recovered a judgment against Niland and VIN in state district court, and filed an abstract of judgment in the Dallas County judgment records. However, on October 14, 1983, the president of TCC executed a release of the judgment lien against the condominium based upon Niland's declaration that the condominium was his homestead.
 
 
 9
 In March of 1983, after seeking the advice of Clifford Sugarman, a financial advisor, Niland ceased making mortgage payments to CSA and listed the property for sale with Sandra Sugarman, a real estate agent. The initial asking price for the property was $545,000, but the asking price was subsequently lowered to $495,000. On June 9, 1983, CSA informed Niland that he was in default under the loan agreement and that the note was being accelerated. On July 12, 1983, CSA appointed a substitute trustee under the deed of trust on the property securing the loan.
 
 
 10
 At this point, Darwin Deason entered the picture. Deason and his wife were shown the property on July 30, 1983. Niland was present at the property when they arrived. Although Deason contacted Clifford Sugarman about purchasing the property, no agreement was reached between Deason and Sugarman for the sale of the property. Deason was later made aware that the property was posted for foreclosure, with the sale to be held on August 2, 1983. Deason attended the foreclosure sale and bid $320,000 for the property. He was the highest bidder, and paid for the property with a $320,000 cashier's check. The substitute trustee conveyed the property to Deason by a deed which contained the following warranty clause:
 
 
 11
 TO HAVE AND TO HOLD the Property, together with the rights, privileges and appurtenances thereto belonging unto the said DARWIN DEASON, his heirs and assigns, forever, and I, said substitute trustee, do hereby bind the said JOHN H. NILAND, his heirs, successors and assigns, to warrant and forever defend the said premises unto DARWIN DEASON, his heirs and assigns forever, against the claim or claims of all persons claiming or to claim the same or any part thereof.
 
 
 12
 Transcript, Vol. 1, at 55. The bankruptcy court found that neither the substitute trustee nor CSA made any oral representations at the sale concerning the property or title to the property, and that there was no evidence of any fraud or misrepresentation on the part of CSA in its dealings with Deason. The bankruptcy court found that the fair market value of the property at the time of the foreclosure sale was $370,000.
 
 
 13
 On August 4, 1983, Deason wrote a letter to Niland, agreeing to let him remain on the property. On October 30, 1983, Deason wrote Niland a letter giving Niland 30 days to vacate the property. On February 27, 1984, Deason wrote Niland a third letter, this time demanding that he vacate the property by March 11, 1984. Niland did not vacate the premises.
 
 II. PROCEEDINGS BELOW
 
 14
 On March 12, 1984, Deason filed a forcible entry and detainer action against Niland in the justice court of Dallas County. On March 28, 1984, Deason filed suit against Niland and CSA in the state district court in Dallas County. On April 30, 1984, Niland filed for protection under Chapter 13 of the Bankruptcy Code. Niland and Tim Truman, the Chapter 13 trustee, instituted a bankruptcy adversary action against Deason, seeking to avoid the foreclosure sale as a fraudulent transfer under 11 U.S.C. Sec. 548, and stating a claim based on state law that CSA's lien on the property was invalid because the property was Niland's homestead. Deason's suit against Niland and CSA and the detainer action filed by Deason were removed to the bankruptcy court and consolidated with the adversary action. Deason answered, contending that the property was not Niland's homestead or, if it was his homestead, that he was estopped to claim it as such. Deason also filed a counterclaim against Niland based on breach of the warranties contained in the deed from the substitute trustee and common law fraud. Deason asserted a cross-claim against CSA alleging breach of the warranties contained in the substitute trustee's deed, common law fraud, and constructive trust. Niland declined to pursue his fraudulent transfer claim, and so the case proceeded to trial on Niland's remaining claim that the property was his homestead and Deason's claims. A trial on these issues was held to the bankruptcy court on February 12, 1985.
 
 
 15
 In a memorandum opinion, the bankruptcy court held: (1) the property was Niland's homestead; (2) Niland was not estopped from claiming the property as his homestead; (3) under Texas law Niland's homestead was limited to one acre, so Deason took good title to .5714 acres of the property, in effect becoming a cotenant with Niland in the property; (4) Deason was damaged to the extent that title to the property failed ($163,303.68) and was subrogated to CSA's note and lien for that amount; and (5) Deason was entitled to an equitable lien against Niland's portion of the property to secure payment of his damages. Although Deason sought damages against Niland and CSA for breach of warranty and fraud, and sought a constructive trust against the $320,000 that he paid CSA for the property, the bankruptcy court did not enter a decision on these claims. On May 21, 1985, both Deason and Niland filed notices of appeal of the bankruptcy court's decision to the United States District Court for the Northern District of Texas.
 
 
 16
 After receiving briefs from the parties, the district court filed its memorandum opinion and order on December 17, 1985, affirming in part and reversing in part the bankruptcy court's decision. The district court affirmed the bankruptcy court's determination that the property was Niland's homestead and that Niland was not estopped from so claiming it. On Deason's claim that the bankruptcy court erred in not entering a decision in his favor on his breach of warranty claims, the district court held that because CSA's lien on the property was void, there was no warranty under which Deason could recover. On Deason's contention that the bankruptcy court erred in not imposing a constructive trust in his favor, the district court affirmed on the basis that a constructive trust could not be imposed against Texas homestead property when the constitutional and statutory requirements for fixing a lien were not met. On Deason's fraud claim, the district court held that the bankruptcy court's finding of no fraud or misrepresentation on CSA's part was not clearly erroneous. The district court reversed the bankruptcy court's imposition of an equitable lien in favor of Deason against Niland's homestead interest in the property, reversed the bankruptcy court's holding that Deason and Niland became cotenants in the property after the foreclosure sale, and remanded the case to the bankruptcy court for a designation by Niland of the one-acre portion of the property constituting his homestead. On December 26, 1987, Deason filed a notice of appeal to this court.
 
 
 17
 On appeal, Deason makes six arguments for the reversal of the district court's decision. First, Deason argues that the district court erred in affirming the bankruptcy court's failure to find breach of warranties and representations on CSA's part and failure to impose a constructive trust. Second, Deason argues that the district court erred in affirming the bankruptcy court's finding that the property was Niland's homestead. Third, Deason argues that the district court erred in affirming the bankruptcy court's conclusion that Niland was not estopped to claim the property as his homestead. Fourth, Deason argues that the district court erred in reversing the bankruptcy court's imposition of an equitable lien against Niland's homestead interest in the property. Fifth, Deason argues that the district court erred in reaching the issues concerning the designation by Niland of the exempt one-acre portion of the property because those issues were not presented to the bankruptcy court, and in reversing and remanding on those issues. Sixth, Deason argues that the bankruptcy court's decision finding fraud and breach of warranty on Niland's part should be reinstated.
 
 
 18
 After setting out the appropriate standard of review in this case, this opinion will address the issues raised in this appeal in four parts. Part One of the opinion will address the issues concerning whether the property is Niland's homestead and, if it is, whether he is estopped to claim it as such. Part Two of this opinion will address Deason's claims for fraud and breach of warranty against Niland and CSA, and Deason's claim that he is entitled to a constructive trust against the funds he paid for the property. Part Three of this opinion will deal with whether Deason was entitled to an equitable lien against the property. Part Four of this opinion will consider the issues concerning designation of the homestead.
 
 III. STANDARD OF REVIEW
 
 19
 This court has recently set out the standard of review applicable to decisions of bankruptcy courts.
 
 
 20
 "A Court's conclusions of law are freely reviewable on appeal. As to all findings of fact, however, a reviewing court of a bankruptcy decision must accept the findings as found, unless they are clearly erroneous." A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Strict application of the clearly erroneous rule is particularly important where the district court has affirmed the bankruptcy court's findings. "When a finding of fact is premised on an improper legal standard, or a proper one improperly applied, that finding loses the insulation of the clearly erroneous rule."
 
 
 21
 Wilson v. Huffman (In re Missionary Baptist Found. of America), 818 F.2d 1135, 1142 (5th Cir.1987) (citations omitted). With this standard of review in mind, we turn to Deason's arguments.
 
 IV. ISSUES ON APPEAL
 Part One: Homestead Issues
 
 22
 The threshold issue in this appeal involves the correctness of the bankruptcy court's determination that the property was Niland's homestead.[2] "It is well settled in [Texas] that in order to establish homestead rights, the proof must show a combination of both overt acts of homestead usage and the intention on the part of the owner to claim the land as a homestead." Lifemark Corp. v. Merritt, 655 S.W.2d 310, 314 (Tex.App.--Houston [14th Dist.] 1983, writ ref'd n.r.e.). Niland testified that he and his wife moved into the house on the property soon after its purchase in 1971 and that Niland has used the property as his home more or less continuously since that time. "[I]nvestigation of intention need not be made when the land is actually put to homestead uses. Such actual use of the land is the most satisfactory and convincing evidence of intention." Id. at 315. In this case, it is not seriously disputed that Niland and his wife moved into the property in 1971 with the intention of using the property as their home, and in fact so used it. We think that this evidence alone was sufficient to enable Niland to meet his burden of establishing the initial homestead character of the property. Hence, we agree with the district court that the bankruptcy court's conclusion that the property constituted Niland's homestead was not clearly erroneous.
 
 
 23
 Deason also argues that, at the time that Niland executed the deed of trust to secure the loan from CSA, his use and occupancy of the property was sporadic, at best. Under Texas law, however, once Niland established the initial homestead character of the property, the homestead status is presumed to continue, and the burden of proof shifts to Deason or CSA to show abandonment of the homestead.
 
 
 24
 The right to a homestead in a particular tract of land, having once vested by ownership and use, is presumed to continue until there is affirmative proof of abandonment. Abandonment is an affirmative defense. The person relying upon the affirmative defense of abandonment has the burden of establishing it. The party relying on abandonment of a homestead has the burden of showing that the homestead claimant moved from the homestead property with the intention of not returning to the property. The evidence relied on establishing abandonment of a homestead must make it "undeniably clear" that there has been "a total abandonment with an intention not to return and claim the exemption" before a homestead, once occupied as such, can be subjected to a forced sale. Neither temporary absence from a homestead nor even temporarily removing to another State alone constitutes abandonment.
 
 
 25
 McFarland v. Rousseau, 667 S.W.2d 929, 931 (Tex.App.--Corpus Christi 1984, no writ) (citations omitted). The only evidence in the record of abandonment consists of Niland's testimony that he moved to Philadelphia for three or four months in the fall of 1975 and again for four or five weeks in 1976. During the 1975 absence, the house was not listed for sale but was instead loaned to a seminary student who maintained the property in the Nilands' absence. Niland testified, however, that his absence from the property during this period was only temporary. Other evidence of abandonment is that Niland rented all but one bedroom of the property by a written lease dated September 1, 1982. Niland testified, however, that the lease was a sham to raise the income figures on his loan application to CSA, and that he continued to live at the property during the term of the "lease." We think that the most that this evidence shows is that Niland had two brief absences from the property in 1975 and 1976; there is no evidence that Niland ever intended to abandon the property as his homestead. Hence, the bankruptcy court's finding that Niland did not intend to abandon the property as his homestead is not clearly erroneous.
 
 
 26
 Having affirmed the bankruptcy court's findings that the property was Niland's homestead and that he did not abandon it, we must consider the issue of whether Niland is estopped to claim the property as his homestead. Deason argues that the numerous sworn misrepresentations on Niland's part to the effect that the condominium, and not the property, was his homestead should estop him from invoking his state constitutional and statutory homestead rights. We think that Texas law is clear that a homestead claimant is not estopped to assert his homestead rights in property on the basis of declarations made to the contrary if, at the time of the declarations, the claimant was in actual use and possession of the property. As the Texas Supreme Court stated nearly a century ago:
 
 
 27
 The Constitution forbidding the fixing on the homestead of liens other than such as are thereby expressly permitted, no estoppel can arise in favor of a lender who has attempted to secure a lien on homestead in actual use and possession of the family, based on declarations of the husband and wife made orally or in writing contrary to the fact. To hold otherwise would practically abrogate the Constitution.
 
 
 28
 If property be homestead in fact and law, lenders must understand that liens can not be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead contrary to the fact will enable parties to evade the law and encumber homesteads with liens forbidden by the Constitution.
 
 
 29
 Texas Land & Loan Co. v. Blalock, 76 Tex. 85, 89, 13 S.W. 12, 13 (1890) (citations omitted); see also Burkhardt v. Lieberman, 138 Tex. 409, 415, 159 S.W.2d 847, 852 (Tex.Comm'n App.1942, opinion adopted); Lincoln v. Bennett, 138 Tex. 56, 61-62, 156 S.W.2d 504, 506-07 (1941). This rule applies even if, as in the case sub judice, the homestead claimant has executed, acknowledged, and filed in the deed records an instrument designating a contrary homestead. See Lincoln, 138 Tex. at 58, 156 S.W.2d at 505. One rationale for this somewhat paternalistic rule is a perception that to permit an estoppel to arise on the basis of a sworn declaration by a person living on property that the property was not his homestead would result in the routine execution of such affidavits by persons owning homesteads in order to obtain loans secured by homestead property for impermissible purposes, thereby rendering the constitutional homestead protection nugatory. See Comment, Estoppel of Husband and Wife to Claim Constitutional Protection of Their Homestead, 25 Tex.L.Rev. 76, 85 n. 42 (1947). This rule is also based on a recognition that many in financial difficulties will sign anything to obtain money from lenders, and that if not put to a duty of inquiry, many lenders will simply have the borrower execute a form affidavit stating that the property is not claimed as homestead. It is interesting to note that this is exactly what happened in this case. The bankruptcy court commented that Niland, in a desperate financial situation, would say, sign, or swear to anything if such was required for the extension of further credit. Niland testified that, at the time that he signed the false homestead designation on a form provided by CSA, he was not aware of what he was signing and had no understanding of the constitutional protection afforded Texas homesteads. Hence, we think that this case presents the classic example of why Texas courts have declined to estop a homestead claimant in actual possession of his homestead property. We do not think that the Texas courts would depart from that rule in this case, and we decline to do so.
 
 
 30
 Deason argues that the Texas Land & Loan Co. v. Blalock line of cases is inapplicable to this case, and that the proper controlling Texas precedent is a line of cases beginning with Eylar v. Eylar, 60 Tex. 315 (1883). We must disagree. We perceive no conflict between the Eylar line of cases and the Blalock line of cases. In Lincoln, supra, the Texas Supreme Court set out three analytical categories in which a homestead claimant would be estopped from claiming his homestead.
 
 
 31
 Our courts have in certain cases enforced against the homestead certain liens which were created neither for purchase money nor for improvements contracted for as provided for in the provision of the Constitution just quoted. Those cases were generally classified as follows: "(1) When the owners, not actually occupying the property, or so using it that its status is dubious at the time the mortgage is executed, represent that it is not their homestead; (2) when the owners create a lien by entering into a simulated transaction which has all the outward appearance of a valid, unconditional sale, but which is in fact a mortgage; (3) when the owners represent that existing notes are valid mechanic's lien notes for improvements, secured by a mechanic's lien contract properly executed."
 
 
 32
 138 Tex. at 59, 156 S.W.2d at 505 (emphasis supplied). The Eylar case fell within the second category. In Eylar, J.F. Eylar and his wife conveyed their homestead to O.A. Eylar by an acknowledged and recorded deed, but argued that this transaction was really intended to be a mortgage. O.A. Eylar, in turn, conveyed the property to Ann Eylar, his mother, who had no knowledge of the sham transaction. J.F. Eylar and his wife remained in possession of the property, paying rent first to O.A. Eylar and later to Ann Eylar. On these facts, the court held that Ann Eylar, the purchaser, need look no further than the deed records, and that the possession of the homestead claimants was not sufficient to put her on notice of their adverse claim. Eylar, therefore, unlike Lincoln and the case sub judice, fell within the second category set out above, in that it involved a simulated transaction which had all the outward appearance of a valid, unconditional sale. We think that the decisions of the Texas Supreme Court in Blalock, Burkhardt, and Lincoln present factual situations much more analogous to the situation in this case, and provide the proper rule of decision on the estoppel issue.[3]
 
 
 33
 Finally, Deason makes much of the fact that Niland persuaded TCC to release its judgment lien against the condominium, and that to not estop Niland from now claiming the property as his homestead would, in effect, give him the benefit of two homesteads, a result not permitted by Texas law. We fail to see how yet another false representation by Niland to a third party changes the result on the estoppel issue. First, contrary to Deason's assertion, Niland did not receive the benefit of two homesteads. Niland merely convinced the president of TCC to release the lien on the condominium and, in so doing, perpetrated another fraud. Niland, however, did not receive the benefit of any homestead rights in the condominium. We would have a very different case had TCC attempted to execute judgment on the condominium and a Texas court had held that judgment could not be had because the condominium was Niland's homestead. Second, Niland's representation to TCC that the condominium was his homestead, which resulted in the lifting of the judgment lien against the condominium, occurred after CSA's loan to Niland. Hence, CSA could not have relied on this representation when it made the loan to Niland. Third, and finally, there is no evidence in the record that Deason was aware of Niland's representation to TCC at the time that Deason purchased at the foreclosure sale. Hence, there is no showing that Deason relied on this misrepresentation. We therefore reject Deason's argument that affirmance of the holdings of the courts below that Niland is not estopped to claim his homestead would give Niland the benefit of two homestead exemptions. Having rejected all of Deason's arguments for reversal, we affirm the conclusion of the courts below that Niland was not estopped from claiming the property as his homestead.
 
 Part Two: Warranty and Fraud Issues
 A. Warranty and fraud claims against CSA:
 
 34
 Deason argues that he is entitled to recover against CSA for breach of the warranty of title contained in the substitute trustee's deed and for fraud. As a remedy for these alleged wrongs by CSA, Deason seeks a constructive trust against the $320,000 that he paid CSA for the property at the foreclosure sale.
 
 
 35
 Addressing the fraud issue first, the bankruptcy court found that CSA had made no oral representations to Deason concerning the property and that there was no evidence of any fraud or misrepresentations by CSA in its dealings with Deason.[4] Deason does not contend that these findings are clearly erroneous, but does argue that the acceptance of the bribe by one of CSA's loan officers made CSA a participant in a fraudulent loan with apparent knowledge of the true facts. This argument is contrary to the facts as found by the bankruptcy court. That court expressly found that CSA had acted in reliance on Niland's false representations that the property was not his homestead. See 50 B.R. at 472 (Findings of Fact 44-46). Similarly, there was no finding by the bankruptcy court that CSA was aware that the loan was "fraudulent." Deason attempts to argue that, because a CSA loan officer accepted a bribe, CSA must have been aware that the property was Niland's homestead. Deason points to no evidence in the record in support of this assertion or, for that matter, any evidence that the bankruptcy court's findings of fact to the contrary are clearly erroneous. Hence, we affirm the bankruptcy court's conclusion that Deason cannot recover against CSA for fraud.
 
 
 36
 Deason also argues that warranties were contained in the substitute trustee's deed and argues that these warranties run from CSA to him and were breached when title to the property partially failed due to Niland's claim of homestead. This argument is contrary to Texas foreclosure law. In a case involving a foreclosure sale under a substitute trustee's deed containing warranty language almost identical to that contained in the trustee's deed in this case, a Texas Court of Appeals held that no warranty of title ran from the lender or the trustee to the purchaser at the foreclosure sale. In summarizing the law on this point, that court stated:
 
 
 37
 In all cases where a debt and a promise to repay are the foundations of the transfer, the transferee takes only a security interest in the property. Stated differently, the deed of trust creates only a lien and does not operate as a transfer of title. This has been the law in Texas for more than 100 years. Since the deed of trust creates only a lien and there is no conveyance in praesenti or in futuro, neither the grantee in the deed of trust nor the beneficiary is a successor or assign of the debtor who executed the instrument.
 
 
 38
 In conformity with the lien theory, a foreclosure sale transfers legal title from the owner of the mortgaged property to the purchaser at the foreclosure sale. The title never vests in the creditor, and the foreclosure deed is not a conveyance from the trustee or the creditor to the purchaser. In executing the foreclosure deed, the trustee does no more than effect the transfer of title from the debtor to the foreclosure purchaser. It follows that the warranty contained in the trustee's deed in this case does not bind the [trustee or the lender] but binds only the [debtor].
 
 
 39
 Sandel v. Burney, 714 S.W.2d 40, 41 (Tex.App.--San Antonio 1986, no writ) (citations omitted); see also Diversified, Inc. v. Walker, 702 S.W.2d 717, 723 (Tex.App.--Houston [1st Dist.] 1985, writ ref'd n.r.e.) (concluding that "there is no precedent in the law that would support any theory of warranty on the part of the noteholder" running to the purchaser at a void foreclosure sale); 34 Tex.Jur.3d Enforcement of Judgments Sec. 163, at 211 (1984) ("A judgment creditor is not a warrantor of the title of property sold at an execution sale. Thus, even though there is a subsequent failure of title to the purchaser, the purchaser may not look to the judgment creditor for relief."). Hence, we conclude that, under Texas law, Deason cannot recover against CSA for breach of warranty of title. We therefore affirm the bankruptcy court's denial of recovery under this theory.
 
 
 40
 Deason's final argument for liability on the part of CSA is his claim that he is entitled to a constructive trust against the funds that he paid CSA for the property to prevent CSA's unjust enrichment. The district court apparently understood Deason to be seeking a constructive trust against Niland's homestead interest in the property and correctly denied relief on the basis of this court's decision in In re Daves, 770 F.2d 1363, 1366-67 (5th Cir.1985). Deason is arguing, however, for a constructive trust against the money that he paid CSA for the property, not a constructive trust on Niland's homestead. Daves is inapplicable to the imposition of a constructive trust against the money that Deason paid to CSA, and we must determine whether Deason is entitled to this remedy.
 
 
 41
 Deason has serious problems in demonstrating his right to a constructive trust under Texas law. We recognize that there is no "unyielding formula" for determining whether the facts of a particular case justify the imposition of a constructive trust. Meadows v. Bierschwale, 516 S.W.2d 125, 131 (Tex.1974). However, Texas courts have generally stated that a prerequisite for the imposition of a constructive trust is actual or constructive fraud. Hamblet v. Coveney, 714 S.W.2d 126, 131 (Tex.App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.). A Texas Court of Appeals recently outlined the distinction between actual and constructive fraud. That court stated:
 
 
 42
 In order to justify imposing a constructive trust on property, fraud, either actual or constructive, must be present. Actual fraud involves dishonesty of purpose or intent to deceive, while constructive fraud usually involves a breach of trust or confidential relationship which equity decrees worthy of protection. Confidential relationships may arise not only from technical fiduciary relationships, but also from "moral, social, domestic or purely personal relationships."
 
 
 43
 Hudspeth v. Stoker, 644 S.W.2d 92, 94 (Tex.App.--San Antonio 1982, writ ref'd) (citations omitted). This court has recognized the requirement in Texas law that the confidential or fiduciary relationship necessary for a finding of constructive fraud must be "prior to and apart from the transaction in question." Harris v. Sentry Title Co., 715 F.2d 941, 946 (5th Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984).
 
 
 44
 Turning first to actual fraud, the bankruptcy court found that CSA was not guilty of any fraud or misrepresentations in its dealings with Deason. We noted above that this finding is not clearly erroneous. Hence, actual fraud cannot be the basis for the constructive trust that Deason seeks, and Deason must therefore look to the existence of a fiduciary or confidential relationship prior to and apart from the transaction in question to support the imposition of a constructive trust. Deason, however, has failed to allege any dealings at all between himself and CSA other than the foreclosure sale. Hence, there is no prior fiduciary or confidential relationship between Deason and CSA that will support the imposition of a constructive trust.
 
 
 45
 Even assuming, however, that Deason could meet the above requirements for the imposition of a constructive trust, the "clean hands" doctrine would preclude the grant of such relief in this case. It is a settled rule that one seeking equity must come to court with clean hands. Deason argues that he meets this requirement because he was an innocent, good faith purchaser at the foreclosure sale. He points an accusing finger at Niland, who admittedly defrauded CSA, and at CSA, whose loan officer accepted a bribe from Niland to "expedite" the loan. From these facts Deason argues that he is the only party in this transaction that is absolutely free of blame. We disagree. Although Deason's conduct does not approach the level of culpability demonstrated by either Niland or CSA, Deason, too, is not totally free of blame for the predicament he now finds himself in.
 
 
 46
 As noted in our review of the facts of this case, the bankruptcy court found that, prior to the foreclosure sale, Deason had been shown the property by a realtor, and that Niland was present and living in the property at this time. 50 B.R. at 473-74. Under Texas law, this put Deason on constructive notice of the possible homestead character of the property. Having such notice, Deason cannot claim the status of a good faith purchaser, and cannot seek the equitable remedy of constructive trust. Cf. Burkhardt, 138 Tex. at 415-16, 159 S.W.2d at 851-52 (purchaser at foreclosure sale with constructive notice of homestead character cannot invoke estoppel against homestead claimants).[5]
 
 
 47
 The bankruptcy court also found that at the time that Deason was shown the property it was listed for either $545,000 or $495,000. Deason, however, obtained the property at the foreclosure sale for only $320,000. The bankruptcy court found that at the time of the foreclosure sale the fair market value of the property was $370,000. Deason, therefore, hoping to obtain the property for $225,000 less than its original listing price and $50,000 less than its fair market value, chose not to purchase the property from Niland but instead to await the foreclosure sale. Had Deason purchased the property from Niland, he would have obtained a warranty deed and no homestead issue would have arisen. Instead, thinking that he could obtain the property for less than it was worth, Deason purchased at the foreclosure sale. He was able to obtain the property at a good price, but, under Texas law, he risked the possibility that there would be a failure of title, as in fact there was. We do not think that a Texas court would protect Deason in this situation, and we decline to do so. Hence, we affirm on other grounds the holding of the district court that Deason is not entitled to a constructive trust against the money that he paid CSA for the property.
 
 
 48
 B. Warranty and fraud claims against Niland:
 
 
 49
 Deason also argues that he is entitled to recover from Niland for breach of warranty and fraud. Niland responds that, under Texas law, a trustee's deed at an invalid foreclosure sale is an utter nullity, and therefore cannot serve as the basis of a breach of warranty claim. Both of these positions have arguable merit. On the one hand, there is language in the Sandel opinion, quoted above, that indicates that the warranty of title in a substitute trustee's deed is effective to bind the mortgagor under the deed of trust. See Sandel, 714 S.W.2d at 41 ("the warranty contained in the trustee's deed in this case does not bind the [trustee or the lender] but binds only the [debtor]"). On the other hand, Niland correctly points out that invalid liens on homestead are regarded by the Texas courts as "utter nullities," see Burkhardt, 138 Tex. at 413, 159 S.W.2d at 850, and it is difficult to see how a void instrument could support an action for breach of warranty. Fortunately, we need not resolve this difficult issue of Texas law, because Texas law provides another remedy for Deason against Niland.
 
 
 50
 Under Texas law, the traditional remedy afforded a purchaser at a void foreclosure sale is subrogation to the debt and lien of the foreclosing mortgagee. "Where a foreclosure sale under a power in a deed of trust is void, the purchaser has the rights of an equitable assignee of the debt and lien. That is, he is entitled to be subrogated to the rights of the trust creditor." Johnson v. Frierson, 133 S.W.2d 594, 597 (Tex.Civ.App.--Waco 1939, writ dism'd judgmt cor.); see 34 Tex.Jur.3d Enforcement of Judgments Sec. 164 at 211 (1984); 53 Tex.Jur.2d Subrogation Sec. 43 at 461-62 (1964). This court has recognized and applied this principle of Texas law. See Russell v. Starkeys, 286 F.2d 736, 739 & n. 4 (5th Cir.1961) (applying Texas rule to property in Oklahoma in the absence of a showing that Oklahoma law was contrary to this general rule). We recognize that in this case, with CSA's lien being invalid due to the homestead character of the property, and Niland having filed for relief under Chapter 13, subrogation to CSA's unsecured note and dischargeable debt is not the best of remedies for Deason. It is, however, the remedy accorded him by Texas law.
 
 
 51
 This somewhat harsh result is consistent with the disinclination of Texas courts to protect purchasers at foreclosure sales. As a general rule, "[o]ne who bids on property at a foreclosure sale does so at his peril. If the trustee conducting the sale has no power or authority to offer the property for sale, or if there is other defect or irregularity which would render the foreclosure sale void, then the purchaser cannot acquire title to the property." Henke v. First Southern Properties, Inc., 586 S.W.2d 617, 620 (Tex.Civ.App.--Waco 1979, writ ref'd n.r.e.). Furthermore, "[t]he general effect of a 'good faith purchaser for value without notice' does not apply to a purchaser at a void foreclosure sale. A purchaser at a foreclosure sale obtains only such title as the trustee had authority to convey." Diversified, 702 S.W.2d at 721. Hence, we hold that Deason is subrogated to CSA's note and lien to the extent of the price he paid for the property at the foreclosure sale--$320,000.
 
 Part Three: Equitable Lien Issues
 
 52
 Deason argues that the bankruptcy court properly imposed an equitable lien on Niland's homestead interest to secure Niland's debt to CSA to which Deason is subrogated. We, however, agree with the district court that the imposition of an equitable lien against Texas homestead property is foreclosed by this court's decision in In re Daves, 770 F.2d 1363 (5th Cir.1985). In Daves, we denied the imposition of an equitable lien against a debtor's homestead property when the lender had failed to comply with the Texas constitutional and statutory procedures for obtaining a valid lien. After reviewing several Texas decisions denying creditors an equitable lien against homestead property, we reasoned as follows:
 
 
 53
 To allow a lien to be imposed on homestead property in the absence of compliance with constitutional and statutory requirements merely by calling it an equitable lien ... would render the constitutional and statutory requirements for imposing liens on homestead property almost meaningless. No Texas decision supports such a result.
 
 
 54
 Id. at 1369. We think that the reasoning in Daves is directly applicable to this case and that the bankruptcy court's decision imposing an equitable lien (which was issued prior to this court's decision in Daves ) was therefore erroneous.
 
 
 55
 Deason contends, however, that the decision in McGoodwin v. McGoodwin, 671 S.W.2d 880 (Tex.1984), expressly permits the imposition of an equitable lien on homestead property. We think that Deason attempts to read too much into the McGoodwin opinion. In McGoodwin, the Texas Supreme Court upheld the imposition of an implied vendor's lien against a claim of homestead on the part of a husband in favor of his ex-wife who deeded her community property interest in the homestead to him in consideration of $22,500 pursuant to a divorce settlement agreement. Of crucial importance to the court's decision was the fact that the implied vendor's lien was to secure the $22,500 purchase money debt of the husband. Id. at 881. In contrast, in the case sub judice, it is undisputed that CSA's lien was not for purchase money, taxes, or improvements on the homestead. Hence, McGoodwin is inapplicable to the situation presented in this case. Furthermore, if Deason is arguing that McGoodwin somehow stands for the proposition that a court may always impose a lien against homestead when equity so requires, we need only note that the court in McGoodwin expressly limited its decision to the facts of the case before it. See id. Hence, we hold that the district court was correct in reversing the bankruptcy court's imposition of an equitable lien against Niland's homestead interest in the property.
 
 Part Four: Designation Issues
 
 56
 As a threshold matter, we address Deason's argument that the issue of designation was not presented to the bankruptcy court, and is therefore not properly before this court on appeal. Our examination of the record indicates that this contention is without merit. The designation issue was set out in the joint pretrial order,[6] and was orally argued to the bankruptcy court.[7] Hence, the designation issue was clearly presented to the bankruptcy court, and is therefore properly before this court on appeal.
 
 
 57
 As noted above, the bankruptcy court held that Deason and Niland owned the property as tenants in common, with Niland owning an undivided one acre as his homestead and Deason owning an undivided .5417 acres representing what remained after Niland's homestead interest was accounted for. Because that court found that the land was not susceptible to partition, it did not attempt to divide the property into a one-acre exempt portion and a .5417-acre non-exempt portion. The district court reversed the bankruptcy court on this issue, and held that Niland had the exclusive right to designate the one acre portion of the property constituting his homestead. Since at the time that the district court decided this issue there was no Texas law on who had the right to designate the exempt portion under the new one-acre urban homestead,[8] the district court analogized to cases decided under the 200-acre rural homestead. Noting that, in the rural context, Texas courts have allowed the debtor to designate the exempt portion of his acreage, the district court held that Niland had the exclusive right to designate the exempt portion of the 1.5417-acre tract. We believe that the district court correctly decided this issue. As that court pointed out, the purpose of Texas homestead law is, and always has been, the protection of the homestead claimant, not the protection of lenders, judgment creditors, or purchasers at foreclosure sales. Furthermore, the Texas courts have always given a liberal construction to the homestead provisions in the Texas Constitution and statutes to protect homestead rights. See Tolman v. Overstreet, 590 S.W.2d 635, 637 (Tex.Civ.App.--Tyler 1979, no writ).
 
 
 58
 Additional support for the district court's decision is found in the 1985 amendments to the Texas Property Code, which expressly provide that the debtor has the right to designate his homestead in both the rural and urban context. Under these amendments to the Property Code, if execution is issued against a landowner and the homestead may be a part of the land, the judgment creditor must give the debtor notice to designate his homestead. Tex.Prop.Code Ann. Sec. 41.023 (Vernon Supp.1987). The debtor then has until the first Monday following the expiration of twenty days to designate his homestead. Id. Sec. 41.022. If the debtor, after notice, fails to designate his homestead, the court may on motion appoint a commissioner to designate the homestead for the debtor. After a hearing on the commissioner's report, if one is requested, the court will designate the debtor's homestead. Id. Sec. 41.023. The excess acreage over the debtor's homestead designation may then be sold. Id. Sec. 41.024. In these sections dealing with the designation of the homestead, the Property Code makes no distinction between urban and rural homesteads, and does not provide for the sale of the entire acreage with a distribution of the proceeds. Hence, we affirm the district court's decision to remand this case to the bankruptcy court in order that Niland may designate the one-acre exempt portion of the property constituting his homestead.[9]
 
 
 59
 In summary, we affirm the judgment of the district court. This case should be remanded to the bankruptcy court so that Niland may designate his homestead interest. Title to the remainder of the land goes to Deason. In addition, Deason is subrogated to CSA's rights against Niland under the note and deed of trust. Deason, however, is entitled to neither an equitable lien nor a constructive trust against Niland's homestead interest in the property. Deason is also not entitled to recover against CSA for either fraud or breach of warranty, and is not entitled to a constructive trust against the money that he paid CSA for the property.
 
 V. CONCLUSION
 
 60
 For the reasons set forth above, the decision of the district court is AFFIRMED and this case is REMANDED to the district court with instructions to remand to the bankruptcy court for further proceedings consistent with this opinion. Deason shall bear the costs of this appeal.
 
 POLITZ, Circuit Judge, specially concurring:
 
 61
 As an Erie court we are mandated to apply Texas substantive law. Accordingly, I must concur in the result. I do so, but only because the comprehensive and scholarly opinion by Judge Randall convincingly establishes that Texas law forecloses a just and fair disposition of this litigation.
 
 
 62
 E. GRADY JOLLY, Circuit Judge, specially concurring:
 
 
 63
 My concurrence in the result that this first-rate legal opinion reaches is one for which I apologize. Contrary, however, to the panel's view of Niland through rose-colored glasses, we should emphasize the real facts of this case and fully recognize the deplorability of the several frauds that he has perpetrated on several people and acknowledge the grave injustice that is done Deason.
 
 
 64
 Instead of this case being the "classic example" (opinion at 18) of the Texas law protecting a helpless, distraught but honest borrower against an overreaching lender, this case is the classic example of Charles Dickens' Mr. Bumble's view of the law.* Here one who has willfully perpetrated several frauds caps his spree of frauds by sticking a thoroughly innocent would-be homeowner to the tune of $320,000. It is terribly unfair for the panel to suggest that Deason has unclean hands when his only "fault" is to attempt to obtain a home at the best purchase price he could secure. Since when did the motive of securing the best price for any item become blameworthy conduct? Indeed, this motive has always been a basic factor in consumer economics.
 
 
 65
 Finally, I simply note that in the prior panel opinion, we tried to distinguish this case from the long line of Texas cases that protect homesteaders who perpetrate frauds on creditors, while recognizing that the rule generally serves the laudable purpose of protecting genuinely helpless homeowners against overreaching creditors. I am still completely convinced that as a practical matter Niland has received the simultaneous benefit of two homestead exemptions, which was the distinction we tried to draw between this and other Texas cases. I have, however, been persuaded by the petitions for rehearing that under close legal analysis, the earlier panel opinion will not fly under Texas skies. I therefore generally concur in the legal conclusions reached in the opinion on rehearing, but do so with the unmistakable sense that in this case the law has operated to create a grave injustice to an individual litigant.
 
 
 
 [1]
 The bankruptcy court noted numerous other false statements by Niland in credit forms and applications to the effect that the condominium, and not the property, was his homestead. The bankruptcy court also noted that Niland testified at a deposition in his divorce proceeding that the condominium was his homestead. Niland's conduct was perhaps best summarized by the bankruptcy court as follows: "It is readily apparent that Niland was prepared to sign and swear to any statement regardless of its truth if the statement resulted in the extension of further credit or an escape from liability." 50 B.R. at 475
 
 
 [2]
 We briefly review the Texas constitutional and statutory provisions protecting the homestead. Texas law recognizes urban and rural homesteads. An urban homestead is defined as follows:
 (a) If used for the purposes of an urban home or as a place to exercise a calling or business in the same urban area, the homestead of a family or a single, adult person, not otherwise entitled to a homestead, shall consist of not more than one acre of land which may be in one or more lots, together with any improvements thereon.
 Tex.Prop.Code Ann. Sec. 41.002 (Vernon Supp.1987). Prior to the 1983 amendments to the Texas Property Code, homeowners were entitled to exempt $5,000 of the value of their homestead together with improvements if the property was acquired prior to 1971, and $10,000 if the property was acquired after 1971. The Texas Property Code, however, expressly makes the new one-acre homestead retroactive. See id. Sec. 41.002(c) ("The definition of a homestead as provided in this section applies to all homesteads in this state whenever created."). The retroactive application of the new acreage homestead exemption has been upheld against a due process challenge. See In re Starns, 52 B.R. 405, 413 (S.D.Tex.1985) (Randall, Circuit Judge, sitting by designation).
 Both the Texas Constitution and Texas statutes exempt the homestead from forced sale with three exceptions. The Texas Constitution provides in relevant part:
 The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used for constructing improvements thereon.... No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided, whether such mortgage, or trust deed, or other lien, shall have been created by the owner alone, or together with his or her spouse, in case the owner is married. All pretended sales of the homestead involving any condition of defeasance shall be void.
 Tex. Const. art. XVI, Sec. 50. On the amount of property that can be claimed as homestead, the Texas Constitution provides:
 The homestead, not in a town or city, shall consist of not more than 200 acres of land, which may be in one or more parcels, with the improvements thereon; the homestead in a city, town or village, shall consist of lot or lots amounting to not more than one acre of land, together with any improvements on the land; provided, that the same shall be used for the purposes of a home, or as a place to exercise the calling or business of the homestead claimant, whether a single adult person, or the head of a family; provided also, that any temporary renting of the homestead shall not change the character of the same, when no other homestead has been acquired.
 Tex. Const. art. XVI, Sec. 51. Following the Texas Constitution, the Texas Property Code provides as follows:
 (a) A homestead and one or more lots used for a place of burial of the dead are exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property.
 (b) Encumbrances may properly be fixed on homestead property for:
 (1) purchase money;
 (2) taxes on the property; or
 (3) work and materials used in constructing improvements on the property if contracted for in writing before the material is furnished or the labor is performed and in a manner required for the conveyance of a homestead, with joinder of both spouses if the homestead claimant is married.
 Tex.Prop.Code Ann. Sec. 41.001 (Vernon Supp.1987). It is undisputed in this case that CSA's loan to Niland was not for purchase money, taxes, or improvements on the property. If the property was Niland's homestead and he was not estopped to claim it as such, the deed of trust under which the property was sold was invalid under the above provisions.
 
 
 [3]
 We note, in passing, the possibility that Eylar was overruled or substantially limited by the Texas Supreme Court's decision in Moore v. Chamberlain, 109 Tex. 64, 195 S.W. 1135 (1917). In Moore, the Texas Supreme Court held, on facts involving a sham transaction similar to the one in the Eylar case, that the possession of the property by the homestead claimant's tenants put the purchaser upon a duty of inquiry concerning the homestead character of the property, and "[t]here being no finding that he exercised any diligence by making inquiry, the possession of the tenants constituted actual notice to him that the deeds were intended as mortgages." Id. at 68, 195 S.W. at 1137. At least one Court of Civil Appeals has questioned whether Moore overruled Eylar. See Mason v. Olds, 198 S.W. 1040, 1045 (Tex.Civ.App.--Fort Worth 1917, writ ref'd). We need not decide the extent to which Eylar remains good law, since we find it inapplicable to this case
 
 
 [4]
 Texas courts have set out the elements of a cause of action for fraud as follows:
 The elements of actionable fraud are: (1) that a material representation was made; (2) that it was false; (3) that when the speaker made it, he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; (6) that he suffered thereby.
 Hamblet v. Coveney, 714 S.W.2d 126, 131 (Tex.App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.).
 
 
 [5]
 As one commentator has noted:
 This doctrine of "constructive notice" to the purchaser is sometimes rather harsh in its result, since in almost all of these cases there has been conduct either intentionally or constructively fraudulent on the part of the [homestead] claimants. However, the policy of the courts has been to go rather far in protecting the family homestead, and the buyer of lien notes or realty must come into court with absolutely clean hands.
 Comment, Estoppel of Husband and Wife to Claim Constitutional Protection of Their Homestead, 25 Tex.L.Rev. 76, 81 (1947).
 
 
 [6]
 The joint pretrial order, under the heading "Legal Issues" provides as follows:
 
 
 [8]
 If the amendment to the Texas Constitution concerning homesteads limits Niland's homestead to one acre, how is the designation of that one acre to be determined when the property in question exceeds one acre
 Transcript, Vol. 1 at 141.
 
 
 [7]
 During closing arguments, counsel for Niland argued:
 If we took the one acre, and I think we're going to have to analogize to the world [sic, probably should read "rural"] situation, which has always been expressed in terms of acres, and we've allowed the farmer to go in and designate which of his two hundred acres is his homestead and allow the excess to be foreclosed. I see no reason why we shouldn't be applying the same rule to urban type lots. You will designate what is your acre and the excess can be sold.
 Transcript, Vol. 4 at 192.
 
 
 [8]
 Deason relies on Clement v. First Nat. Bank of Paris, Tx., 115 Tex. 342, 282 S.W. 558 (1926), and General Bonding & Casualty Ins. Co. v. Trabue, 174 S.W. 689 (Tex.Civ.App.--Texarkana 1915, no writ), for the proposition that the entire property can be sold and the portion of the proceeds of the sale representing the non-exempt portion be used to satisfy his debt. These cases both involved urban homesteads, but are distinguishable from the case sub judice in that they were decided at the time when the homestead had a value limit of $5,000. Under the old urban homestead statutes containing a value limitation, homesteads could be sold to reach the excess value. E.g., Hoffman v. Love, 494 S.W.2d 591, 596 (Tex.Civ.App.--Dallas), writ ref'd n.r.e. per curiam, 499 S.W.2d 295 (Tex.1973). One of the reasons for the change to an acreage limitation on Texas urban homesteads was to prevent the forced sale of homesteads. See Comment, Perspectives on Urban Homestead Exemptions--Texas Amends Article XVI, Section 51, 15 St. Mary's L.J. 603, 623 n. 127 (citing Debate on Tex.H.R.J. Res. 105 on the Floor of the House, 68th Leg. (April 14, 1983)). Hence, we find Deason's arguments for the sale of the property unpersuasive
 
 
 [9]
 We note that in its response to Niland's petition for panel rehearing, CSA raises for the first time the contention that its lien against Niland's homestead was valid under the doctrine of equitable subrogation, and that therefore the foreclosure sale under the deed of trust was effective to pass title to Deason. This court does not address arguments raised for the first time on appeal, and certainly does not address arguments raised for the first time in a response to a motion for rehearing
 
 
 *
 "If the law supposes that," said Mr. Bumble, ... "the law is a ass--a idiot." Charles Dickens, Oliver Twist, ch. 51